**TEXACO INC. and Texaco Gas Marketing Inc., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Mojave Pipeline Co., et al., Intervenors.**

No. 93–1515.
Consolidated with Nos. 93–1593, 93–1604, 93–1789, 93–1808.

United States Court of Appeals, District of Columbia Circuit.

Argued March 26, 1998.

Decided July 17, 1998.

Kim M. Clark (for Burlington Resources Oil & Gas Co.), with whom Katherine B. Edwards and Nancy J. Skancke (for Mobil Exploration & Producing U.S., Inc., Texaco Inc., and Texaco Gas Marketing Inc.), John P. Beall (for Texaco Inc. and Texaco Gas Marketing Inc.), and Donald Ayer and Norman A. Pedersen (for Southern California Utility Power Pool and Imperial Irrigation District), were on the joint briefs, argued the cause for petitioners. James K. Morse and Jason F. Leif entered appearances for petitioners.

Susan J. Court, Special Counsel, Federal Energy Regulatory Commission ("FERC"), with whom Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor, FERC, were on the brief, argued the cause for respondent.

Richard C. Green and Kenneth M. Minesinger were on the brief for intervenor Mojave Pipeline Company.

Before EDWARDS, Chief Judge, TATEL, Circuit Judge, and BUCKLEY, Senior Circuit Judge.

BUCKLEY, Senior Judge:

Texaco Inc. and various other natural gas shippers that have firm transportation contracts with Mojave Pipeline Company (collectively "Texaco"), petition the court to vacate Federal Energy Regulatory Commission ("FERC" or "Commission") orders mandating that Mojave set its rates according to the straight fixed-variable method. Because FERC's findings that such pricing by Mojave would be in the public interest are supported by substantial evidence, we deny the petitions.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

Section 7 of the Natural Gas Act ("NGA"), 15 U.S.C. § 717f, "prohibits the construction of certain natural gas pipeline facilities without a certificate of public convenience and necessity issued by the Commission." *Altamont Gas Transmission Co. v. FERC*, 92 F.3d 1239, 1243 (D.C.Cir.1996). To satisfy section 7's "public convenience and necessity" requirement, an applicant must prove that the facility it proposes to build "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). Following promulgation of *Regulation of Natural Gas Pipelines after Partial Wellhead Decontrol*, FERC Stats. & Regs. ¶ 30,665 (1985) ("Order 436"), parties were allowed to seek optional expedited certificates ("OEC"), which entitled them to begin construction of a pipeline without first securing a FERC finding of public convenience and necessity. *See id.* at 31,573–85. In exchange for expedited licensing under Order 436, OEC licensees were obligated to assume the financial risks associated with building the facility. *Associated Gas Distrib. v. FERC*, 824 F.2d 981, 1030–31 (D.C.Cir.1987).

The risk that a pipeline will be unused falls upon whichever party is liable for the pipeline's fixed costs, which include the costs of its construction and maintenance. *See Transcontinental Gas Pipe Line Corp. v. FERC*, 54 F.3d 893, 895 (D.C.Cir.1995). A pipeline that operates under a traditional section 7 license typically recovers between 25 and 50 percent of its fixed costs through FERC-approved reservation charges, i.e., monthly fees paid by customers who reserve a stated transportation capacity within a pipeline, whether or not they actually use it. *See Wisconsin Gas Co. v. FERC*, 770 F.2d 1144, 1149–50 (D.C.Cir.1985). By contrast, OEC licensees, which had assumed the risks of the pipeline project, generally recovered most of their fixed costs through usage charges to their customers, which were based on the volume of gas shipped. *See TransCo-*

*lorado Gas Transp. Co.,* 67 FERC ¶ 61,301, 62,053 (1994). As a result, under the prevailing OEC licensee rate design, most fixed costs and all variable costs were recovered through usage charges while only nominal amounts were recovered through reservation fees.

In 1992, FERC issued Order No. 636, *see Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation under Part 284 of the Commission's Regulations, and Regulation of Natural Gas Pipelines after Partial Wellhead Decontrol,* FERC Stats. & Regs. ¶ 30,939 (1992) ("Order 636"), which was designed to promote competition at the natural gas wellhead by increasing the transparency of natural gas pricing. *See Pennsylvania Office of Consumer Advocate v. FERC,* 131 F.3d 182, 183 (D.C.Cir.1997), *modified by* 134 F.3d 422 (D.C.Cir.1998); *United Distrib. Cos. v. FERC,* 88 F.3d 1105, 1125–27 (D.C.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1723, 137 L.Ed.2d 845 (1997) ("*UDC*"). Order 636 required, in part, that pipelines set their charges by the straight fixed-variable ("SFV") method, according to which pipelines were required to

> allocate fixed costs to the reservation charge, and variable costs to the usage charge. The Commission mandated SFV so that fixed costs, which vary greatly between pipelines, would no longer affect the usage charge and thus distort the national gas-sales market that Order No. 636 fosters.

*See id.* at 1129 (footnote omitted).

## B. Facts

In 1985, first Mojave and then the Kern River Gas Transmission Co. ("Kern River") petitioned FERC under section 7 of the NGA for a permit to build and to operate natural gas pipelines serving southern California. *See* 15 U.S.C. § 717f(c)(1)(A). Before FERC had completed comparative hearings to determine which company would receive a section 7 license, *see Ashbacker Radio Corp. v. FCC,* 326 U.S. 327, 333–34, 66 S.Ct. 148, 90 L.Ed. 108 (1945) (requiring comparative hearings to determine assignment of an exclusive license where there is more than one

applicant), the Wyoming–California Pipeline Co.("WyCal") petitioned for an OEC to build and operate a pipeline substantially similar to those proposed by Mojave and Kern River. Because OEC applicants agree to assume the financial risk associated with under use, FERC permits multiple OEC licensees to build facilities for the same market without first conducting *Ashbacker* hearings. *See Questar Pipeline Co.,* 59 FERC ¶ 61,307, 62,140–41 (1992) (holding that *Ashbacker* proceedings are unnecessary in OEC cases).

Once WyCal had applied for an OEC, both Mojave and Kern River abandoned their section 7 petitions and filed OEC applications of their own. In its contracts with prospective clients, Mojave agreed to assign most of its fixed costs to the usage fee, thereby assuming the greatest share of the financial risk associated with the construction and maintenance of the pipeline. The rate-setting scheme adopted by Mojave, in which "some of the fixed costs are assigned to the reservation charge, but some of the fixed costs, including return on equity and income taxes, are assigned to the usage charge along with all the variable costs," is commonly called modified fixed-variable ("MFV"). *Union Pacific Fuels, Inc. v. FERC,* 129 F.3d 157, 159 (D.C.Cir.1997); *see Transcontinental Gas,* 54 F.3d at 895 ("Under MFV, a portion of the pipeline's fixed costs—return on equity and related income taxes—is included in the commodity charge, not the demand charge."); *see also* Mojave's Service Agreement Applicable to Transportation Service Under Rate Schedules FT–1 and IT–1 § 4.1(a) ("Service Agreement"). FERC issued a license to Mojave in 1989. *See Mojave Pipeline Co.,* 56 FERC ¶ 61,282 (1991); *Mojave Pipeline Co.,* 50 FERC ¶ 61,069 (1990).

In its November 1992 rate filing, which was submitted shortly after Order 636 had been promulgated, Mojave proposed maintaining its MFV rate structure for existing customers but adopting SFV-based pricing for new customers. *See Mojave Pipeline Co.,* 62 FERC ¶ 61,195, 62,362 (1993) ("Compliance Order"). Acting pursuant to its authority under section 5 of the NGA, 15 U.S.C. § 717d(a), FERC rejected Mojave's plan to retain MFV in part and ordered the

pipeline to file a new rate schedule applying SFV rates to all its customers. *Id.* at 62,-364–66. FERC found that permitting Mojave to compute any of its charges according to MFV would distort the pricing information signals that Order 636 was designed to regularize. *Id.* at 62,365. The Commission affirmed its decision in two subsequent opinions denying rehearing. *See Mojave Pipeline Co.,* 64 FERC ¶ 61,047 (1993) ("First Rehearing Order"); *Mojave Pipeline Co.,* 65 FERC ¶ 61,059 (1993) ("Second Rehearing Order").

The Compliance Order therefore reassigned the risk of under use from Mojave to the shippers while leaving the contract otherwise intact. *See* Compliance Order, 62 FERC at 62,361 (binding pre-Order 636 shippers to their contracts unless they were able to sell them to other prospective shippers).

## II. DISCUSSION

Texaco claims that FERC lacked the authority to impose SFV rates on shippers whose contracts specified MFV rates. In the alternative, it asserts that FERC's denial of an exemption from Order 636 to Mojave shippers was arbitrary and capricious, that FERC failed to justify its refusal to adopt an alternative plan presented by one of the petitioners, and that FERC was required to hold a hearing to resolve questions of material fact. We have jurisdiction over Texaco's petition pursuant to 15 U.S.C. § 717r(b).

## A. Standard of Review

■ As a general matter, we will uphold FERC's factual findings if supported by substantial evidence and will endorse its orders so long as they are based on reasoned decision making. *See Koch Gateway Pipeline Co. v. FERC,* 136 F.3d 810, 814 (D.C.Cir. 1998). We will also defer to the agency's reasonable interpretation both of its own regulations and of contracts that are subject to its rules. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Williams Natural Gas Co. v. FERC,* 3 F.3d 1544, 1550–51 (D.C.Cir.1993).

## B. FERC's Burden of Proof and the *Mobile–Sierra* Doctrine

### 1. Applicability of the Mobile–Sierra Doctrine

■ At the outset, we must determine whether the *Mobile–Sierra* doctrine applies in this case. *See FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 354–55, 76 S.Ct. 368, 100 L.Ed. 388 (1956); *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 344, 76 S.Ct. 373, 100 L.Ed. 373 (1956). That doctrine holds that where parties have negotiated a natural gas shipment contract that sets firm prices or dictates a specific method for computing shipping charges and that denies either party the right to change such prices or charges unilaterally, FERC may abrogate or modify the contract only if the public interest so requires. *See City of Oglesby v. FERC,* 610 F.2d 897, 899–900 (D.C.Cir.1979); *Appalachian Power Co. v. FPC,* 529 F.2d 342, 348 (D.C.Cir.1976); *see also Pennzoil Co. v. FERC,* 645 F.2d 360, 373 (5th Cir.1981) (noting that the NGA "did not displace but only superimposed federal regulation on private contractual arrangements").

■ Section 4 of the Service Agreement establishes a formula for determining the applicable rates chargeable for transportation services; and, in subsection 4.8, Mojave agrees that it "shall not exercise [its] rights under Section 4 of the [NGA, 15 U.S.C. § 717c], to change the rates to be paid by the Shipper." The Commission nevertheless found that Mojave's service agreements were not covered by the *Mobile–Sierra* doctrine for two reasons: first, "[b]y expressly prohibiting only unilateral rate changes proposed under NGA section 4, the contracts ... implicitly recognize the Commission's ability to take the instant section 5 action." Compliance Order, 62 FERC at 62,365, (stating that section 5 of the NGA permits FERC to set aside rates that it finds unjust or unreasonable); second, "the contracts specifically provide that Mojave and the Shippers must comply with all applicable Commission regulations in the performance of the contracts." *Id.* (citing section 12.6 of the Service Agreement). We address each of these positions in turn.

In dicta in a recent opinion, *see Union Pacific Fuels, Inc. v. FERC,* 129 F.3d 157 (D.C.Cir.1997), we inadvertently lent support to the inference that FERC now draws from the parties' failure to state explicitly, in their service agreements, that the Commission was precluded from ordering alterations of the rate design for reasons other than that such changes were required by the public interest. In that case, we stated:

> A contract between private parties may preserve FERC's right to impose new rates by *"leav[ing] unaffected* the power of the Commission ... to replace not only rates that are contrary to the public interest but also rates that are unjust [or] unreasonable."

*Id.* at 161 (quoting *Papago Tribal Util. Auth. v. FERC,* 723 F.2d 950, 953 (D.C.Cir.1983)) (emphasis added). That quotation from *Papago* is misleading, and it does not represent the law. In discussing alternative contractual approaches for the revision of rates, the *Papago* court said:

> [T]he parties may contractually eliminate the utility's right to make immediately effective rate changes ... but leave unaffected the power of the Commission ... to replace not only rates that are contrary to the public interest but also rates that are unjust, unreasonable, or unduly discriminatory or preferential to the detriment of the contracting purchaser.

*Papago,* 723 F.2d at 953. The court did not suggest that the parties' failure to explicitly foreclose the Commission's authority to replace rates would leave it intact. The law is quite clear: absent contractual language "susceptible to the construction that the rate may be altered while the contract[ ] subsist[s]," the *Mobile–Sierra* doctrine applies. *Appalachian Power Co.,* 529 F.2d at 348.

With respect to FERC's second argument, section 12.6 of the Service Agreement reads:

> In performance of this Service Agreement, Shipper and Transporter shall comply with all applicable laws, statutes, ordinances, safety codes and rules and regulations of governmental authorities having jurisdiction.

Although we are bound to respect FERC's reasonable interpretation of contracts that fall within its jurisdiction, *see Southeastern Michigan Gas Co. v. FERC,* 133 F.3d 34, 44 (D.C.Cir.1998), the Commission's interpretation of this language is unreasonable. Section 12.6 is merely a generic contract clause compelling both parties to adhere to the law. *See, e.g., Huntzinger v. Hastings Mutual Ins. Co.,* 143 F.3d 302, 304, (7th Cir.1998) (quoting nearly identical term in land purchase contract); *Bradshaw v. United States,* 83 F.3d 1175, 1184 n. 2 (10th Cir.1995) (quoting nearly identical term in liquidation agreement); *Yellow Taxi Co. v. NLRB,* 721 F.2d 366, 379 (D.C.Cir.1983) (quoting identical term in leasing agreement).

Indeed, the structure of the Mojave contracts confirms the banal nature of section 12.6 and its irrelevance to rate setting. All the contract's pricing terms are consolidated in section 4, while section 12 is limited to generic contract concerns (e.g., severability and waiver of rights). Because nothing in the agreements suggests that the contracting parties intended to grant Mojave unilateral authority to modify shipment rates, we turn to whether Mojave and the shippers "agree[d] to a specific rate or whether they agree[d] to a rate changeable in a specific manner." *Richmond Power & Light Co. v. FPC,* 481 F.2d 490, 497 (D.C.Cir.1973). If they did either, the *Mobile–Sierra* doctrine applies.

The Mojave service agreements expressly enumerate the manner in which transportation fees will be computed and set a maximum charge. *See* Service Agreement §§ 4.1, 4.1.1. The parties therefore "agree[d] to [both] a specific [maximum] rate [and] ... to a [general] rate changeable in a specific manner." *Richmond Power & Light,* 481 F.2d at 497. Thus the prerequisites for invoking the *Mobile–Sierra* doctrine have been met.

### 2. Application of Mobile–Sierra *Doctrine to the Mojave Service Agreements*

 Because the *Mobile–Sierra* doctrine applies, FERC's reformation of the Mojave contracts will be upheld only if FERC has shown that the public interest required it to intervene. *See Metropolitan Edison Co. v. FERC,* 595 F.2d 851, 855–56 (D.C.Cir.

1979). FERC relies in part on the public interest rationale articulated in Order 636 to justify its modification of the Mojave contracts. *See* First Rehearing Order, 64 FERC at 61,383. But the "public interest" that permits FERC to modify private contracts is different from and more exacting than the "public interest" that FERC seeks to serve when it promulgates its rules. *Compare* 15 U.S.C. § 717(a) ("Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.") *with Sierra Pacific*, 350 U.S. at 355, 76 S.Ct. 368 (stating that "the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory"). FERC's rulemaking authority requires only that it point to a generic public interest in favor of a proposed rule; the public interest necessary to override a private contract, however, is significantly more particularized and requires analysis of the manner in which the contract harms the public interest and of the extent to which abrogation or reformation mitigates the contract's deleterious effect. *Cf. id.* (permitting modification of firm contracts only if "the scheme of regulation imposed is necessary in the public interest" (citation and internal quotations omitted)); *Papago*, 723 F.2d at 954.

Because of these differences, more is required to justify regulatory intervention in a private contract than a simple reference to the policies served by a particular rule. The Commission, however, did not rest its reformation of the Mojave agreements on the generalized public interest goals underlying Order 636. Rather, it determined that the retention of MFV rate design would adversely affect the public interest in two ways: first, it would distort gas market pricing to the detriment of the "integrated national gas sales market," Compliance Order, 62 FERC at 62,365–66; and second, it "would be particularly anti-competitive" because it would harm Mojave's main competitor, Kern River, "in California and elsewhere." *Id.* at 62,366

(internal quotations and footnote omitted). The Commission also determined that to the extent that permitting both Mojave and Kern River to retain MFV pricing might mitigate the second problem, it would exacerbate the first. Because the length of their pipelines differ and they transport gas from different regions, FERC concluded that "allowing Mojave and Kern River to remain on MFV would distort competition between different producing regions in the very manner that the Commission is seeking to avoid through its [Order 636] SFV policy." First Rehearing Order, 64 FERC at 61,389.

In its Compliance Order, the Commission not only discussed the broad public interest underlying its preference for uniform SFV pricing but also explained how Mojave's retention of some MFV-based charges would threaten the coherence of the national policy and distort the local gas market to the detriment of Mojave's competitors. *See* Compliance Order, 62 FERC at 62,365–66. FERC therefore satisfied its obligation to articulate supportable and reasonable explanations for how the public interest required modification of a private contract.

C. Allegation that FERC's Imposition of SFV Rate Design was Arbitrary and Capricious

■ Texaco further contends that FERC's decision to impose SFV rate design was arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). It alleges: (1) that compliance with Order 636 arbitrarily reallocated financial risks and compromised the rate stability that were implicit in the OEC process as originally conceived and (2) that adopting the SFV method of cost allocation unfairly hurt consumer interests. We addressed the first argument in *Union Pacific*, where we noted that that case "present[ed] a paradigmatic example of an agency reasonably changing its policies, and implementing the consequences of those changes to the detriment of some parties and the benefit of others." *Union Pacific*, 129 F.3d at 162. Order 636 and its application to Mojave were premised on well articulated policies favoring transparency in shipping charges. *See* Compliance Order, 62 FERC at 62,365–66. The risk of

uncertainty is inherent in regulated industries, and as the *Union Pacific* court noted, was in fact taken into account by the Commission in this instance. *See* 129 F.3d at 163.

The second claim amounts to a complaint that Mojave's customers have lost the benefit of their bargains. Natural gas shippers always contract in the shadow of the regulatory state, and they cannot presume that their contracts are immune to its inherent risks. The Commission acted reasonably to implement a policy whose long-term effect will ostensibly improve the efficiency and flexibility of the market as a whole. It cannot be said, then, that FERC acted either arbitrarily or capriciously.

### D. FERC's Unwillingness to Grant Mojave an Exception

■ Texaco contends that the Mojave shippers were entitled to an exemption from SFV rate design under the Commission's Order 636–related rules. *See* Order 636, ¶ 30,939 at 30,434 (stating that FERC will consider alternative rate design when conditions warrant it and the parties agree); *Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation under Part 284 of the Commission's Regulations, and Regulation of Natural Gas Pipelines after Partial Wellhead Decontrol,* FERC Stats. & Regs., Regs. Preambles ¶ 30,950, 30,605 (1992) ("Order 636–A") (holding that parties seeking to be freed from SFV must overcome a rebuttable presumption in SFV's viability). Texaco's argument is of three parts: (1) competitive pressures in the California market have resulted in such large discounts in usage charges that imposition of SFV-based pricing does not make sense; (2) an exception would prevent Mojave's reaping a significant windfall from mandatory SFV pricing; and (3) notwithstanding whether the other arguments prove availing, the Mojave service agreements embodied discounts that necessarily survive imposition of Order 636.

In Order 636, FERC stated that it would not

rigidly preclude the pipeline, its customers, and interested state commissions, producers, marketers, brokers, end-users, and others from agreeing to an alternative method that deviates from SFV and may be appropriate to that particular pipeline system. If the parties affected by a pipeline's rate design agree to a different method, the Commission will consider giving effect to the parties' agreement.... [A]ny party ... advocating something other than SFV carries a heavy burden of persuasion.

Order 636, ¶ 30,939 at 30,434. In this instance, FERC found that Texaco failed to satisfy its "heavy burden of persuasion" because it failed to address FERC's concern that however low the usage rates might be, so long as they reflected any element of the pipeline's fixed costs, they would obscure the relative costs of producing the gas the pipelines carried. *See* First Rehearing Order, 64 FERC at 61,389.

As we have previously noted, "[t]he natural gas industry is functionally separated into production, transportation, and distribution." *UDC,* 88 F.3d at 1122. Order 636 was designed to foster competition among natural gas producers by ensuring that commodity prices reflected the difference in extraction costs at the wellhead. *See* First Rehearing Order, 64 FERC at 61,388. FERC intended that disaggregation of transportation and production charges would encourage consumers to purchase gas from the lowest cost producer, that market demand would create an incentive for more low-cost gas production, and that producers' desire to satisfy that demand would result in an increase in the amount of low cost gas available to consumers. *See* Order 636, ¶ 30,939 at 30,434–35. It is therefore irrelevant how low usage rates may be at a given time so long as the intermingling of pipelines' fixed and variable costs obscures differences in producer costs. Thus, contrary to Texaco's claims, the prevalence of low transportation charges in the market that Mojave serves does not moot the purpose of Order 636.

Texaco next contends that FERC has granted exceptions to similarly situated transporters in the past and that it has repeatedly permitted pipelines to retain non-SFV negotiated rates since issuing the orders challenged in this case. We are satis-

fied that the non-Order 636 cases upon which Texaco relies are inapposite, and exceptions granted after issuance of the orders under review in this case "play no role in our determination of the orders' legality." *Union Pacific*, 129 F.3d at 164.

Texaco also claims that the imposition of SFV pricing provided Mojave with a windfall. Mojave's profits have no bearing on this dispute. Order 636 was promulgated and the orders under review were issued to promote a national gas policy and to ensure that Mojave's rate design did not frustrate that purpose. Regulatory evolution is endemic to the natural gas market, *see, e.g., Southeastern Michigan*, 133 F.3d at 45–46, and that it might occur should have been anticipated by the shippers, *see Union Pacific*, 129 F.3d at 163.

Finally, Texaco contends that the service agreements embodied pre-Order 636 discounts that should survive its implementation. In Order 636, FERC stated that it would not disturb pre-existing discounts that had been "negotiated and included in [a] contract either [as] a fixed rate or [as] some permanent form of discount, such as ninety percent of the maximum rate." Order 636, ¶ 30,939 at 30,454. Texaco maintains that Mojave's MFV rate design was itself a "discount."

Texaco's argument rests upon a misunderstanding of the nature of the exempted discounts to which Order 636 referred and upon a misinterpretation of a series of unrelated Commission pronouncements. First, FERC reasonably construed its reference to rate discounts in Order 636 to mean a markdown on an otherwise generally applicable rate. *See* Second Rehearing Order, 65 FERC at 61,469. Mojave's rate design included lower reservation fees (and commensurately higher usage charges), but the reservation fee was not discounted from the otherwise applicable rate. Texaco confuses MFV rate design with rate abatement.

Second, Texaco argues that FERC's reference to Mojave's "discounted reservation fee" in an earlier licensing proceeding, *see Mojave Pipeline Co.*, 56 FERC ¶ 61,282, 62,102 (1991), binds it in the current matter. In its Second Rehearing Order, however, the Com-

mission distinguished between discounts subject to the Order 636 exemption and its use of similar language in the licensing order. *See* Second Rehearing Order, 65 FERC at 61,469. Because FERC's explanation of the distinction is reasonable, we defer to its construction of the two orders. *See Natural Gas Clearinghouse v. FERC*, 108 F.3d 397, 399 (D.C.Cir.1997) (holding that Commission's reasonable interpretation of its own orders will be upheld).

Third, Texaco asserts that FERC's denial of the exemption contradicted its precedent. In *El Paso Natural Gas Co.*, 63 FERC ¶ 61,-139 (1993), upon which Texaco relies, the Commission permitted the pipeline to retain discounts on its maximum backhaul rate for shippers whose contracts included such discounts prior to promulgation of Order 636. *See id.* at 61,939, 61,940–41. Contrary to Texaco's claim, however, the *El Paso* case is inapposite: it concerned discounting the maximum applicable rate and not an alternative rate design.

## E. FERC's Refusal to Adopt an Alternative Hybrid Plan

■ Texaco claims that the Commission arbitrarily rejected one of the Mojave shippers' proposals for a hybrid MFV/SFV rate design in which the shippers would pay the contracted MFV-based reservation charge for unused capacity and a higher SFV-based reservation charge for used capacity. In its Second Rehearing Order, in which it rejected the proposal, FERC noted that, under the proposed scheme,

> payment of the pipeline's fixed costs would vary depending upon its usage of the pipeline. The more it used its capacity, the more fixed costs it would incur.... [Thus,] just as under MFV, the rate charged for each additional unit of gas shipped on Mojave's system would include fixed costs, and not, as under SFV, just the variable costs associated with shipping that unit of gas.

65 FERC at 61,468. Texaco now claims that the Commission's rejection of the alternative proposal betrayed its ignorance of local mar-

ket conditions and is therefore suffused with error.

The hybrid proposal, however, contains the same erroneous assumption we noted earlier. To the degree that a pipeline's rate structure includes any portion of its fixed costs in its usage fees, it will be more difficult to determine and compare the wellhead costs of the gas it carries. As FERC noted in its Second Rehearing Order and repeats on appeal, the hybrid rate proposal is impermissible not because of its effect upon gas consumers but because it fails to remedy the market problem inherent in undifferentiated natural gas pricing. *See* Second Rehearing Order, 65 FERC at 61,468.

### F. Necessity of a Factual Hearing

 Texaco claims that the existence of facts unique to Mojave and the California gas market required FERC to hold an evidentiary hearing before ruling on its application for an exemption from Order 636's SFV rate design. This argument fails because the facts upon which Texaco based its claim were part of the paper record before FERC, and FERC accepted their validity. *See* First Rehearing Order, 64 FERC at 61,390. Nor has Texaco referred the court to any issue of "motive, intent, [ ] credibility ... [or] past occurrence," *Louisiana Ass'n of Independent Producers & Royalty Owners v. FERC*, 958 F.2d 1101, 1113 (D.C.Cir.1992), that would require the Commission to hold a hearing rather than decide the case on the basis of the paper record. Under the circumstances, we cannot quarrel with the Commission's conclusion that none was required. *See id.* at 1113–14.

### III. CONCLUSION

For the foregoing reasons, the petitions for review are denied.

*So ordered.*