# United States Court of Appeals
## For the First Circuit

No. 00-1055

BOSTON EDISON COMPANY,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.

_____

NEW ENGLAND POWER COMPANY,

Intervenor.

_____

ON PETITION FOR REVIEW OF ORDERS OF
THE FEDERAL ENERGY REGULATORY COMMISSION

_____

Before

Torruella, <u>Chief Judge</u>,

Wallace,[*] <u>Senior Circuit Judge</u>,

and Boudin, <u>Circuit Judge</u>.

_____

<u>Carmen L. Gentile</u> with whom <u>James H. McGrew</u>, <u>David Martin Connelly</u>, <u>Bruder, Gentile & Marcoux, L.L.P.</u> and <u>Neven Rabadjija</u>, Associate General Counsel, Legal Department, Boston Edison Company, were on brief for petitioner.
<u>John H. Conway</u>, Acting Solicitor, with whom <u>Douglas W. Smith</u>, General Counsel, <u>Timm L. Abendroth</u> and <u>Judith A. Albert</u> were on brief for respondent.
<u>Marvin T. Griff</u> with whom <u>Isaac D. Benkin</u> and <u>Winthrop, Stimson, Putnam & Roberts</u> were on brief for intervenor.

_____

[*]Of the Ninth Circuit, sitting by designation.

BOUDIN, Circuit Judge.  Before us are two petitions for review filed by Boston Edison Company concerning contracts allocating output from, and costs associated with, operation of its Pilgrim nuclear power station in Plymouth, Massachusetts. In one case, Boston Edison seeks review of Federal Energy Regulatory Commission ("FERC") orders reducing its rate of return on common equity in the Pilgrim plant and directing refunds to Montaup and Commonwealth Electric Companies.  In the other, Boston Edison claims that amendments terminating its contracts with Montaup and Commonwealth upon the recent sale of the Pilgrim plant have extinguished any rights to these refunds.

1.  The pertinent facts track the life cycle of the Pilgrim plant.  On August 1, 1972, four months before the unit became operational, Boston Edison entered into virtually identical "entitlement" contracts with Montaup and with Commonwealth, then known as the New Bedford Gas and Edison Light Company.  Each was "entitled" to 11 percent of Pilgrim's output in return for bearing 11 percent of costs and expenses, including, as part of "total financing and income tax" expenses, a return of 13.5 percent on common equity--35 percent of the original capital for the plant. Boston Edison promptly filed

both contracts with FERC as Rate Schedules No. 68 (Commonwealth) and No. 69 (Montaup).

Midway in the Pilgrim's progress from birth to projected retirement, Boston Edison and Montaup amended their contract, assertedly to allay Boston Edison's concerns about its ability to recover its full actual costs and to provide for the possibility that the plant might outlive the contract's 28-year term. Effective January 1, 1985, the amendment added decommissioning pre-charges as an allocable expense and altered Boston Edison's chargeable return on common equity from 13.5 percent to the return "allowed by the [Massachusetts] Department of Public Utilities in [Boston Edison's] most recent retail rate decision."[2]

The Department of Public Utilities, later renamed the Department of Telecommunications and Energy, was already responsible for approving the permissible rates of return on common equity for the 74.27 percent of Pilgrim's output that

---

[2]Generally, sales of wholesale (i.e., between generating companies and distributors) electric energy in interstate commerce are subject to FERC regulation, 16 U.S.C. § 824 (1994), while retail sales (i.e., between distributors and local customers) are subject to state regulation, Mass. Gen. Laws ch. 164, §§ 93-94E (1997). See also Town of Norwood v. FERC, 202 F.3d 392, 396 (1st Cir. 2000), petition for cert. filed, 68 U.S.L.W. 3756 (U.S. May 30, 2000) (No. 99-1914). Boston Edison engaged in both kinds of sales and thus was subject to dual regulation. [Throughout this opinion cites to 16 U.S.C. are to the 1994 edition unless indicated otherwise.]

-3-

Boston Edison retailed directly; the 1985 amendment in the Montaup contract, and similar modifications in Boston Edison's other entitlement contracts, sought to make the state's decisions binding as to the remaining 25.73 percent that Boston Edison sold wholesale.[3] The amendment in Commonwealth's contract, made in 1989, kept its return on equity at 13.5 percent until a pending docket before the state utility commission set a new rate, or until the next retail decision if no rate was set in that docket. The Montaup and Commonwealth amendments, which also made other changes not pertinent here, were filed with FERC.

As initially filed, the amendments bound Montaup and Commonwealth to whatever rate the Massachusetts agency approved for Boston Edison's retail customers, with no upper limit. Each amendment, however, was followed by Boston Edison's filing with FERC of a "rate schedule supplement," establishing a specific ceiling on common equity rates of return. Each supplement said that if the state agency were to approve a retail rate of return above the ceiling, Boston Edison "may file" an application with

---

[3]In addition to the 22 percent of Pilgrim's output allocated to Montaup and to Commonwealth, Boston Edison also contracted with 14 Massachusetts municipal utilities which, in the aggregate, accounted for an additional 3.73 percent of Pilgrim's power. Boston Edison Co. v. FERC, 856 F.2d 361, 362 (1st Cir. 1988); see also Boston Edison Co., 62 F.E.R.C. ¶ 61010, at 61,031-32 (Jan. 12, 1993) (listing the municipal systems).

FERC "pursuant to terms of Section 205 of the Federal Power Act [16 U.S.C. § 824d(d)] . . . to temporarily modify said ceiling."

Absent such an application, the 1985 supplement fixed the ceiling for Montaup at 15.25 percent, and the 1989 supplement set the ceiling for Commonwealth at 13.5 percent, which was also the original and interim contractual rate for Commonwealth. According to Boston Edison, the state agency never established a retail rate higher than 12.0 percent; thus that rate applied to Montaup's contract until its termination in 1999. Similarly, because no new rate resulted from the state docket pending in 1989, Commonwealth, under its amended contract, continued to pay at the 13.5 percent rate. The use of section 205 to lift these ceilings, therefore, remained a moot issue.

In November 1992, anticipating the substantial costs of dismantling the Pilgrim nuclear power plant, Boston Edison filed a petition under section 205 for an increase in decommissioning expenses. Boston Edison Co., 62 F.E.R.C. ¶ 61,010, at 61,029 (Jan. 12, 1993). FERC accepted the increased charges for filing, but suspended them pending a hearing based on a preliminary judgment that they might not be just and reasonable. Id. at 61,030; see 16 U.S.C. § 824d(e). At the same time, believing that the rates of return being collected on common equity might be similarly suspect, FERC began an

-5-

investigation into existing rates under section 206(a) of the Act, 16 U.S.C. § 824e(a).

After a five-day hearing in September 1993, a FERC administrative law judge ("ALJ") found the additional decommissioning charges just and reasonable (subject to an adjustment not here at issue), but the 12.0 and 13.5 percent returns (applicable, respectively, to Montaup and to Commonwealth) on common equity "unjust and unreasonable within the meaning of section 206." Boston Edison Co., 66 F.E.R.C. ¶ 63,013, at 65,086 (Mar. 25, 1994) ("Initial Decision"). The ALJ recommended a new return on common equity of 10.71 percent, effective from March 20, 1993. In so doing, the ALJ rejected Boston Edison's argument that, under the so-called Mobile-Sierra doctrine, the agency could modify the contractual rates only if they "adversely affect the public interest," Federal Power Comm'n v. Sierra Pacific Power Co., 350 U.S. 348, 355 (1956); accord United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 345 (1956).

On December 19, 1996, FERC released its own decision on review of the ALJ order. Boston Edison Co., 77 F.E.R.C. ¶ 61,272, at 62,172-73 (Dec. 19, 1996) (Opinion No. 411). FERC summarily affirmed the ALJ's conclusion that the just and reasonable standard pertained, and applying his recommended rate of 10.71 percent for the period from March 20, 1993, to June 20,

-6-

1994, ordered refunds for that 15-month period pursuant to 16 U.S.C. § 824e(b). FERC also directed Boston Edison to file a new schedule using a rate of 11.22 percent prospectively (to reflect a rise in U.S. Treasury Bond yields since the ALJ's recommendation was made).

FERC subsequently denied Boston Edison's petition for rehearing. Boston Edison Co., 88 F.E.R.C. ¶ 61,267, at 61,841-42 (Sept. 20, 1999) (Opinion No. 411-A). The rehearing order is important, however, because in it FERC provided a new and distinct rationale for its earlier conclusion that the use of the just and reasonable standard was consistent with the Mobile-Sierra doctrine. The overall effect of FERC's two orders was to require a reduction in Boston Edison rates for Montaup and Commonwealth and refunds amounting to almost $5 million.

The events bearing on the present case include one other transaction and separate FERC proceedings. Earlier in 1999 before Opinion No. 411-A issued, FERC in separate dockets approved Boston Edison's sale of the Pilgrim plant to Entergy. Boston Edison Co. & Entergy Nuclear Generation Co., 87 F.E.R.C. ¶ 61,034 (Apr. 5, 1999) ("Order on Sale of Facilities, Rate Filings, and Petition for Declaratory Order"); Boston Edison Co. & Entergy Nuclear Generation Co., 87 F.E.R.C. ¶ 61,053 (Apr. 7, 1999) ("Order Conditionally Authorizing Sale of Jurisdictional Facilities"). In these dockets, FERC accepted agreed-to

-7-

"termination amendments" to Boston Edison's entitlement contracts with Montaup and Commonwealth which stated that the contracts would be terminated upon Pilgrim's sale, to be replaced by new arrangements with Entergy. Boston Edison transferred the Pilgrim plant to Entergy on July 13, 1999.

In its compliance filing made in response to Opinion No. 411, and in a petition for rehearing of Opinion No. 411-A, Boston Edison argued that the FERC-approved termination amendments had extinguished Montaup's and Commonwealth's rights to the refunds mandated in those opinions. FERC concluded otherwise and, in a single order, rejected Boston Edison's compliance filing and request for rehearing. Boston Edison Co., 90 F.E.R.C. ¶ 61,039, at 61,188 (Jan. 14, 2000) ("Order Denying Rehearing and Rejecting Compliance Filing").

Boston Edison has now petitioned this court for review of the orders reflected in Opinions No. 411 and 411-A, and for review of the January 14, 2000, order. See 16 U.S.C. § 825l(b). Its central claim is that FERC has no authority to alter the contract rates, or to order refunds based on such an alteration, unless FERC first finds that the existing contracts are contrary to the public interest under Mobile-Sierra. In the alternative, Boston Edison argues that any refund claims that Montaup and Commonwealth had under the two opinions were extinguished by the termination amendments on the sale of the Pilgrim plant. FERC

-8-

and Montaup support the orders under review; Commonwealth, which is now an affiliate of Boston Edison, stands silent.

2.  To understand Mobile-Sierra requires a brief step back to the regulatory scheme.  In regulating electricity rates, the Federal Power Act follows (with variations) a well-developed model:[4]  the utility sets the rates in the first instance, 16 U.S.C. § 824d(a), subject to a basic statutory obligation that rates be just and reasonable and not unduly discriminatory or preferential, id. §§ 824d(a)-(b).  FERC, which inherited the powers of its predecessor (the Federal Power Commission), can investigate a newly filed rate (section 205, id. § 824d(e)), or an existing rate (section 206, id. § 824e(a)), and, if the rate is inconsistent with the statutory standard, order a change in the rate to make it conform to that standard, id. §§ 824d(e), 824e(a)-(b).

The procedural incidents and FERC's ability to provide refunds vary depending on whether the proceeding is one to investigate a new rate filing or an existing rate.  For example,

_____

[4]The first of the major federal rate-regulation statutes was the Interstate Commerce Act of 1887, 24 Stat. 379.  Although now effectively supplanted as to railroad rates, it provided the model successively for the regulation of interstate electrical transmission in the Federal Power Act of 1920, 41 Stat. 1063; interstate telephone service in the Communications Act of 1934, 48 Stat. 1064; natural gas transmission in the Natural Gas Act of 1938, 52 Stat. 821; and interstate airline service in the Civil Aeronautics Act of 1938, 52 Stat. 973.

in the former case, the burden is on the utility to show that its rate is lawful, 16 U.S.C. § 824d(e), and, in the latter, the burden is on the FERC staff or the customer to show that the rate is unlawful, id. § 824e(b). In both circumstances, however, the statutory test of lawfulness is phrased in the same terms. What the Mobile-Sierra decisions did, in certain of the cases where the utility and its customer have made a contract governing the rates to be charged, was to drive a wedge between the two sections, and vary the statutory standard in a way that no one can discern from the statutory language alone. See Sierra, 350 U.S. at 355.

Traditionally, contracts fixing utility or carrier rates have been anathema to the courts because, almost by definition, they suggest different treatment of similarly-situated customers in contravention of the basic principle of non-discrimination. See, e.g., New York v. United States, 331 U.S. 284, 296-97 (1947). But the customers in interstate sales of electricity and natural gas sales have tended to be big companies, and negotiated contracts formed a useful means of allocating risks. When Congress imposed rate regulation in the Federal Power Act, and then again in the Natural Gas Act, it acknowledged--in contrast to its initially pure tariff-based regulation of railroads and telephone companies--that contracts

-10-

between individual parties could also be used to set rates. See, e.g., 16 U.S.C. §§ 824d(d), 824e(a).

In the Mobile and Sierra decisions, the Supreme Court sought to mesh this new respect for contracts under the Federal Power and Natural Gas Acts with the traditional scheme of regulation. It held that where the electrical utility (or natural gas company) and its customer have contracted for a particular rate, and the agency has accepted the contract for filing and then allowed the rate to become effective, (1) the utility cannot unilaterally (i.e., without the customer's consent) file a new rate under section 205 to supersede the agreed-upon rate; and (2) the agency's power under section 206 to alter the existing contract rate under the just and reasonable standard is also curtailed. Sierra, 350 U.S. at 352-55; accord Mobile, 350 U.S. at 347 (same as to sections 4 and 5 of the Natural Gas Act). For example, FERC cannot order an increase in a contracted-for rate merely by finding that the rate is unreasonably low in the traditional sense that it is insufficient to produce a reasonable return on capital for the seller. Sierra, 350 U.S. at 354-55; accord Northeast Utils. Serv. Co. v. FERC, 55 F.3d 686, 690 (1st Cir. 1995).

Instead, importing a term that does not appear in the rate regulation provisions of the Federal Power Act or the Natural Gas Act, the Supreme Court said that the contract rate

-11-

could be raised only if it offended the "public interest"; and the example given was of a rate so low that it threatened the survival of the utility, excessively burdened other consumers, or imposed undue discrimination.  <u>Sierra</u>, 350 U.S. at 355.  This solution based on a public interest standard, although created out of whole cloth,[5] makes practical sense when one understands the facts out of which <u>Mobile</u> and <u>Sierra</u> arose, namely, blatant attempts to raise rates by sellers in violation of their contracts.  But it left open several further problems, such as when the contract should be read as setting a binding rate and what circumstances might justify FERC supplanting a contract rate as contrary to the public interest.

It is easy enough to understand why Boston Edison invoked the <u>Mobile</u>-<u>Sierra</u> doctrine.  Its original contracts, as modified by the 1985 and 1989 supplements, initially agreed to specified rates of return on equity (12 percent to be paid by Montaup and 13.5 percent for Commonwealth)--rates that, in the end, were never changed.[6]  FERC ordered future rate reductions

---

[5]The public interest standard is often used in public utility statutes for deciding whether new facilities may be built, or a sale or merger approved.  <u>E.g.</u>, Federal Power Act, § 203, 16 U.S.C. § 824b.  In these contexts, but not in rate regulation, practice and precedent supply a measure of content to the concept.

[6]Rates of return are not themselves rates in the statutory sense (<u>e.g.</u>, dollars per kilowatt hour) but can be used to determine the rates.  <u>Cf.</u> <u>Richmond Power & Light</u> v. <u>Federal</u>

for Boston Edison and refunds for the two customers on the premise that the just and reasonable rates of return were less than those provided for in the contracts and actually charged. See 77 F.E.R.C. ¶ 61,272, at 62,171-72.  And FERC never found that the higher rates of return fixed by contract were contrary to the public interest.

The ALJ's basic answer to Mobile-Sierra, summarily adopted by FERC in its initial order (Opinion No. 411), was straightforward.  He reasoned that the contractual intent to disable FERC from using the just and reasonable standard must be clear, 66 F.E.R.C. ¶ 63,013, at 65,075; that "the rate of return provision of the Pilgrim contracts contain no restrictions on changes to the rates for any period of time," id.; that the agreements contain a general "[Laws,] Regulations and Approvals" clause making them subject to on-going agency regulation, id.; and that this clause "[c]learly . . . contemplates review of the rate of return at any time as the Commission deems necessary" under the just and reasonable standard, id.

FERC is entitled to some deference in construing contracts where the sales are subject to FERC regulation. United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., 358

_____

Power Comm'n, 481 F.2d 490, 497 (D.C. Cir.), cert. denied sub no. Indiana & Mich. Elec. v. Anderson Power & Light, 414 U.S. 1068 (1973).

U.S. 103, 114 (1958); see also Boston Edison Co. v. FERC, 856 F.2d 361, 363 (1st Cir. 1988). But no one reading these contracts at the time they were written would doubt that the parties had bargained for a specific rate of return at the outset or, under the amendments, for a formula or method of fixing those rates of return. Cf. Richmond Power, 481 F.2d at 497. And the period of time was obviously the duration of the contract, unless the parties agreed to changes themselves, as they did in the 1985 and 1989 amendments, or unless FERC overrode the contracts with a public interest finding.

The Mobile-Sierra doctrine has hung over the electric power and natural gas industries since 1956, and the two cases are probably among the dozen best-known public utility decisions by the Supreme Court in this century. At least until recently, anyone bargaining in the shadow of the doctrine would assume that a contract unconditionally setting a fixed rate, or a fixed rate of return, would be governed by Mobile-Sierra. See, e.g., 66 F.E.R.C. ¶ 63,013, at 65,073. This was certainly so in 1972 when the Pilgrim plant contract framework was constructed; and the 1985 and 1989 amendments only varied the method for identifying the proper rate of return in that formula. Nothing in the amendments suggests that the parties had a later intent to enlarge FERC's authority to reduce the contracted-for rates. The only aspect of the contractual relationship that suggests

-14-

the parties intended <u>any</u> FERC involvement beyond <u>Mobile</u>-<u>Sierra</u> may be found in the amendment supplements, but those merely give FERC an option to <u>increase</u> those rates if the state agency adopts ones above the cap.

In 1972, as today, the parties could negate the protection afforded by <u>Mobile</u>-<u>Sierra</u> by providing that a contract rate initially fixed by the parties and filed with FERC could be overridden by FERC at any time under the just and reasonable standard.  <u>See</u> <u>Memphis Light</u>, 358 U.S. at 112; <u>see also</u> <u>Papago Tribal Utility Auth.</u> v. <u>FERC</u>, 723 F.2d 950, 953 (D.C. Cir. 1983), <u>cert. denied</u>, 467 U.S. 1241 (1984); <u>Kansas Cities</u> v. <u>FERC</u>, 723 F.2d 82, 87 (D.C. Cir. 1983).  The ALJ said that the parties had effectively done just this by the "Laws, Regulations and Approvals" clause.  It reads as follows (to make clear his reasoning, we add the emphasis supplied by the ALJ):

> This Agreement is made subject to present and future Federal, State and local laws and to present and future regulations and orders properly issued by Federal, State and local bodies having jurisdiction; and performance hereunder is conditioned upon securing and retaining such Federal, State and local governmental and regulatory approvals, grants and permits <u>as may from time to time be necessary</u>.

66 F.E.R.C. ¶ 63,013, at 65,075.

-15-

The opening portion of the clause ("made subject to") is the standard boilerplate inserted by lawyers to protect against lawful supervening directives. It is very hard to read it either as adopting the just and reasonable standard for rate review or as making lawful a FERC rate order that would be unlawful under <u>Mobile</u>-<u>Sierra</u>. The closing ("performance hereunder") portion of the clause, which contains the language underscored by the ALJ, clearly pertains to regulatory actions such as the grant of a construction or operating license and not to rate decisions. In short, the rationale of the ALJ, which FERC initially adopted by cross-reference, is not persuasive.

Our view of the matter accords with the most recent decision of the D.C. Circuit on both points, namely, that the specification of a rate or formula by itself implicates <u>Mobile</u>-<u>Sierra</u> (unless the parties negate the implication) and that a generally framed boilerplate clause (like the "Laws, Regulations and Approvals" clause here) does not constitute such a negation. <u>Texaco, Inc.</u> v. <u>FERC</u>, 148 F.3d 1091, 1096 (D.C. Cir. 1998); <u>cf.</u> <u>Appalachian Power Co.</u> v. <u>Federal Power Comm'n</u>, 529 F.2d 342, 348 (D.C. Cir.), <u>cert. denied</u>, 429 U.S. 816 (1976). <u>Texaco</u> arguably impairs the D.C. Circuit's earlier decision in <u>Kansas Cities</u>, 723 F.2d at 86-87, here relied upon by FERC; but that case is

distinguishable in any event.[7] The truth is that the cases, even within the D.C. Circuit itself, do not form a completely consistent pattern. Compare, e.g., Texaco, 148 F.3d at 1096, with Union Pac. Fuels, Inc. v. FERC, 129 F.3d 157, 161-62 (D.C. Cir. 1997).

On rehearing, FERC reaffirmed its support for the ALJ's rationale but, understandably uneasy (Texaco had been decided in the meantime), offered a new rationale for avoiding Mobile-Sierra. Reverting to a staff argument mentioned but not relied on by the ALJ, FERC's rehearing order noted that in the 1985 and 1989 contract amendments, Boston Edison had consented to numerical caps on the rate of return that governed under the contracts, even if the state authorized a retail rate above the cap levels; but the utility had also reserved a right to ask FERC under section 205 to approve the state-approved, above-cap rates under a just and reasonable standard. 88 F.E.R.C. ¶ 61,267, at 61,841. In short, the contract provided a cap but also a safety valve.

---

[7]The pertinent contract in Kansas Cities had specified that one set of rates could not be changed without a public interest finding and the court inferred by negative implication that the other set of rates in the contract could be changed without such a finding, although the court also cited the general purpose boilerplate clause to shore up its conclusion. Kansas Cities, 723 F.2d at 88-90.

FERC said that because this cap and safety valve regime employed the just and reasonable standard to protect Boston Edison, it made sense--both as a matter of contract interpretation and regulatory policy--to employ the same standard in reviewing rates below the cap. 88 F.E.R.C. ¶ 61,267, at 61,841. In reality, it makes sense under neither criterion, and FERC should not be resorting to such an argument; it fosters the impression that the agency will say anything it needs to achieve its ends, ends that could probably be achieved prospectively with a modicum of forethought, effort, and candor.

Starting with contract interpretation, the cap and safety valve is a self-contained regime patently designed to protect interstate purchasers from paying an excessive rate of return that might be fixed by the state agency in consideration of local purchasers. Thus a cap was imposed at the top, with no corresponding minimum floor; but since the cap itself might prove to be too confining under certain economic conditions, the safety valve was added to allow Boston Edison to escape the cap assuming FERC approved. Nothing in this balanced solution suggests that, in agreeing that the state rate should <u>otherwise</u> be binding, the parties intended to negate the ordinary, default rule that <u>Mobile</u>-<u>Sierra</u> governed FERC-proposed changes, <u>Texaco</u>, 148 F.3d at 1096.

As to the supposed policy grounds invoked by FERC, FERC says that Boston Edison is attempting to bind FERC to a "stricter [public interest] standard than that to which the party is itself bound," 88 F.E.R.C. ¶ 61,267 at 61,841, the latter obviously referring to Boston Edison's option to seek to exceed the cap under the just and reasonable standard. This is rhetoric rather than policy. Mobile-Sierra's premise is that the parties can nullify FERC's authority to make changes in private contracts except when required in the public interest; if this is so, it is not a further infringement of FERC's authority for the parties to reserve an area within which FERC retains limited authority under a different standard (here, just and reasonable) to police one area of special concern.

Whether and when Mobile-Sierra applies in varying contexts is going to remain in confusion unless and until FERC makes up its mind and squarely confronts the underlying issues. It is not at all clear to us that FERC, which is now becoming hostile to Mobile-Sierra, needs to tolerate it at all. FERC has reasonably broad powers to regulate the substantive terms of filings that it accepts and allows to become effective, whether they are ordinary tariffs or contracts, see In re Permian Basin Area Rate Cases, 390 U.S. 747, 777-80 (1968); and such powers may include the power to require prospectively, by regulation, that all contracts set their rates subject to FERC's just and

-19-

reasonable standard. Obviously, we do not decide the point, and whether it would be good policy is a very different question.[8]

Alternatively, if FERC were neutral toward or opposed to such clauses but wanted to eliminate much of the existing uncertainty as to the parties' intent, it might prescribe prospectively the terms that parties would have to use to invoke Mobile-Sierra protection. This would at least be a more winning approach than efforts to impose such requirements ad hoc, and, as here, after contracts have been drafted, signed, accepted for filing by FERC, and implemented. See, e.g., San Diego Gas & Elec. Co. v. Public Serv. Co., 91 F.E.R.C. ¶ 61,233 (June 1, 2000); Florida Power & Light Co., 67 F.E.R.C. ¶ 61,141 (May 3, 1994); Southern Co. Servs., Inc., 67 F.E.R.C. ¶ 61,080 (Apr. 19, 1994). Arguably, such regulations as to form would more easily survive judicial scrutiny than a general ban on contract provisions seeking to invoke Mobile-Sierra.

FERC is not entirely to be blamed for the present confusion: some of the problems arise from the failure of the

_____

[8]Utility regulation is normally justified to offset market or monopoly power, which may or may not be present in transactions such as the ones before us. Where it is not, private ordering by contract may be superior to regulation--a view increasingly reflected in Congressional reforms. See, e.g., 49 U.S.C. §§ 10707, 10709 (Supp. II 1996) (railroad regulation); see generally, Western Coal Traffic League v. United States, 719 F.2d 772, 776-77 (5th Cir. 1983) (en banc), cert. denied, 466 U.S. 953 (1984).

parties to be clear about their intentions, see, e.g., Memphis Light, 358 U.S. at 109; some from changing attitudes of the courts and the agency, see, e.g., Kansas Cities, 723 F.2d at 87; and some from wholesale confusion about just what concrete circumstances would allow a contract to be overridden under Mobile-Sierra, see, e.g., Transmission Access Policy Study Group v. FERC, 2000 WL 762706, at *35-*39 (D.C. Cir. 2000). But FERC should stop trying to re-write deals that the parties have already made under the aegis of Mobile-Sierra--unless it properly invokes the public interest standard--and instead take the longer view and decide what it wants or does not want in new contracts.

Even though we conclude that Mobile-Sierra applies in this case, FERC might still override the contract rates in question on remand by determining that they are contrary to the public interest. Sierra, 350 U.S. at 355; Mobile, 350 U.S. at 345. Admittedly, the rates are too high for the period in question to be just and reasonable (or at least Boston Edison has chosen not to contest this ruling); but are they so high as to be contrary to the public interest--and what would this mean anyway? See generally Northeast Utils. Serv. Co. v. FERC, 993 F.2d 937, 961 (1st Cir. 1993). Very little useful precedent exists; FERC has made no findings and offered no interpretation of the concept in this case; and the parties have not briefed

-21-

the issue on appeal. Certainly, we have no interest in anticipating it.

On remand, the parties are free to litigate the public interest issue before FERC, but it is worth suggesting that this is a case best resolved by settlement. Boston Edison has sold Pilgrim, and new contracts are in force between the new owner (Entergy) and Montaup and Commonwealth. As to refunding past payments, the only issue is money, and the parties are likely to waste much of it on lawyers' fees by litigating the public interest issue which, being terra incognita as to rate reductions, promises further appellate strife however it might be resolved by FERC.

3. There remains Boston Edison's alternative claim on appeal that, even if it owed refunds as determined by FERC, Montaup and Commonwealth surrendered their rights when they signed the termination agreements. If we thought this argument were correct, it would waste everyone's time to remand the case to see whether refunds could be justified by analyzing the rates under the public interest standard: the termination amendments would waive any refund claims regardless of the standard used to invalidate the rates actually charged. We conclude, however, that Boston Edison's waiver argument fails on the merits.

At the outset, FERC says that Boston Edison's waiver argument should be rejected because not properly preserved. It

-22-

relies upon a provision of the Federal Power Act that says: "No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon." 16 U.S.C. § 825l(a). This is in substance an exhaustion-of-remedies provision but, being statutory in character, it is somewhat less susceptible to the implied exceptions, which courts have liberally devised where the exhaustion requirement is created by the courts rather than Congress. E.g., McCarthy v. Madigan, 503 U.S. 140, 144 (1992); Coit Independence Joint Venture v. Federal Sav. and Loan Ins. Corp., 489 U.S. 561, 579 (1989).

What happened here is that the termination amendments were filed in April 1999 and became effective in July 1999, more than two years after Boston Edison had petitioned for rehearing of the refunds ordered in Opinion No. 411. Once FERC denied rehearing of that decision in September 1999 in Opinion No. 411-A, Boston Edison invoked the termination amendments as a separate defense to refunds; first in early October by including the argument in its Opinion No. 411-compelled compliance filing, and then again later in October (in more abbreviated form) in a petition for rehearing of Opinion No. 411-A. The parties then exchanged arguments on the issue in briefs addressed to the compliance filing.

-23-

In its January 2000 order, FERC resolved the dispute by ruling that the termination amendments did not cut off the refunds it had ordered. 90 F.E.R.C. ¶ 61,039, at 61,188. On this basis, FERC found that Boston Edison's compliance filing was insufficient and that the petition for rehearing of Opinion No. 411-A should be denied. Id. at 61,191. FERC's present threshold argument is that Boston Edison cannot challenge this interpretation of the termination amendments in court because it did not first seek a rehearing by FERC of its January 2000, order. Such a position, however, stretches the exhaustion doctrine beyond its limits and makes no sense in relation to the doctrine's rationale.

Boston Edison had already raised its objection to the refunds, based on the termination agreements, by petition for rehearing, namely, the petition addressed to Order No. 411-A. FERC directly addressed this argument in its January 2000, order. Thus, the gist of the relevant argument that Boston Edison wants to make on appeal was in fact presented to FERC on rehearing and rejected on the merits. The idea that Boston Edison was compelled to repeat the same arguments in a second petition for rehearing makes no sense and is at odds with settled authority. See Boston Gas Co. v. FERC, 575 F.2d 975, 978 (1st Cir. 1978); see also Southern Natural Gas Co. v. FERC, 877 F.2d 1066, 1072-73 (D.C. Cir. 1989).

-24-

Turning to the termination agreements themselves, each contains a section, entitled "Termination of Remaining Rights and Obligations Under Power Sale Agreement," that specifies: "To the extent that continuation or survival of the rights and obligations of Boston Edison and [Montaup and Commonwealth] under the Power Sale Agreement are not expressly provided for in this Amendment, they are hereby extinguished." Boston Edison's argument, in a nut shell, is that nothing else in the amendments specifically preserved the buyers' rights to the refunds ordered by FERC and that therefore those rights were extinguished.

FERC concluded that this provision (section 7) standing alone is "ambiguous," but it pointed to two other sections--6 and 15--that it read as preserving the buyers' rights to the FERC-ordered refunds. 90 F.E.R.C. ¶ 61,039, at 61,190-91. FERC says that its reading of the amendments is entitled to deference while Boston Edison offers a different reading of those sections and says that  FERC's reading is unreasonable. We are ourselves doubtful about the agency's reasoning, but we do not rely upon it in arriving at the same result.  The interpretation of private contracts is, of course, ultimately a matter for the courts although the agency's views may be entitled to a measure of deference. Boston Edison Co. v. FERC, 856 F.2d 361, 363-64 (1st Cir. 1988).

-25-

By its terms, section 7 is addressed to extinguishing, except as elsewhere preserved, rights and obligations "under the Power Sale Agreement," i.e., rights and obligations created by or pursuant to the agreement. But the refunds awarded to the buyers by FERC are not rights under the agreement at all; indeed, if the agreements were respected, there would be no refunds. It is only because FERC has overridden the agreements and awarded refunds "under" the statute that refund claims might exist. Cf. Union Dry Goods Co. v. Georgia Pub. Serv. Corp., 248 U.S. 372, 376-77 (1919). On this reading, section 7 does not address such claims at all.

This reading is bolstered by sections 6 and 15 which also, by their terms, are directed to rights, obligations and the like "pursuant to" the power sale agreement (section 6) or termination amendment (section 15). Thus, both the extinguishing section and the two reservation sections are basically addressed to contract claims, not to FERC-ordered refunds based on the statute. Boston Edison makes this very point to distinguish the reference to "refunds" in section 6, apparently without realizing that the argument also serves to distinguish section 7 (to its disadvantage).

Boston Edison says that if the termination amendments are deemed ambiguous, then it should have been allowed to rely on extrinsic evidence. We do not view the amendments standing

-26-

alone as ambiguous,[9] but neither do we think that the extrinsic evidence relied on by Boston Edison would alter the result even if fully considered. In urging that the compliance filing be rejected, Montaup said that Boston Edison had originally drafted the termination amendment to make clear that FERC-ordered refund claims were not extinguished, that this language had been omitted from the final version drafted by Boston Edison, but that Montaup had assumed that no change in meaning was intended. By contrast, Boston Edison would have us interpret the omission as manifesting an intent to exclude any refund rights.

This would be a closer case if Boston Edison had claimed before FERC to have evidence of actual discussions between its own negotiators and those of Montaup in which the parties discussed the FERC refunds and concluded that the termination agreement should extinguish rather than reserve rights thereto. But Boston Edison did not, and does not, make such a claim. Absent a timely proffer of extrinsic evidence at least this compelling, we have no reason to worry about whether anything outside the language of the agreement could properly be consulted in construing it. Boston Edison relies upon two other

---

[9]FERC said the amendments were ambiguous but, in context, it seems rather to have meant that section 7 viewed alone was ambiguous but that sections 6 and 15 resolved the uncertainty. However, because our own reasoning is different than that of FERC, what FERC's reference to ambiguity means is beside the point.

items, both filings made by Montaup in which it referred to or employed the 12 percent rate of return in making calculations instead of using the FERC-determined rate. The inferences from these filing are too weak to merit further discussion.

The orders reflected in Opinions No. 411 and 411-A are vacated to the extent that they hold that Boston Edison's rates of return on common equity were unlawfully high under the just and reasonable standard and to the extent that they order refunds on that premise. The matter is remanded to FERC for further proceedings on the rate of return and refunds issues consistent with this decision.

It is so ordered.

**--Concurrence and Dissent by Judge Wallace Follows--**

WALLACE, Circuit Judge, concurring and dissenting. I write separately to express my disagreement with the majority opinion's analysis of the effect the termination agreements between Boston Edison and Montaup have on refunds ordered by FERC.

I

The majority opinion states, "the refunds awarded to the buyers by FERC are not rights under the agreement at all; indeed, if the agreements were respected, there would be no refunds. It is only because FERC has overridden the agreements and awarded refunds 'under' the statute that refund claims might exist." [Majority Opinion 22] However, it is equally clear that without the original contractual relationship between Boston Edison and Montaup, the refund obligation would not exist. It is true that the original contracts between Boston Edison and Montaup did not contain a provision stating, "FERC-ordered refunds shall be considered as a right or obligation under the contract," but they did contain language stating, "This Agreement is made subject to present and future Federal, State and local laws and to present and future regulations and orders properly issued by Federal, State and local bodies having jurisdiction . . ." [Majority Opinion 13 (emphasis added)] While the majority rightly holds that this provision does not assist FERC in its argument that the "just and reasonable"

-29-

standard should apply, we must not overlook the fact that this language was drafted with the knowledge of FERC's authority over the contracts. Thus, it does indicate an intent by the parties to be bound by any properly issued FERC order involving their contractual relations, including FERC-directed refunds.

I am further troubled by the majority's analysis because all of the parties, including FERC, proceeded under the assumption, until we ordered supplemental briefing on the issue, that Section 7 of the termination agreement's reference to "rights and obligations" encompassed the refunds ordered by FERC. Instead, the parties focused on whether the termination agreement reserved or extinguished Montaup's right to a FERC-ordered refund, not on whether such a refund constituted a right under the original contracts. Indeed, FERC wrote in its supplemental brief, "It cannot be said with certainty whether the Commission would agree or disagree with the [majority's] suggested reading or, alternatively, find it to be a permissible alternative, because the Commission simply was not presented with it and has not addressed it." I respectfully point out that a "court ordinarily must review a decision of an administrative agency on the basis of the agency's own rationale; unlike the situation involving appellate review of judicial decisions, it cannot affirm the agency on a theory that, although supported by the record, was not the basis of the

agency's ruling." <u>Bivings</u> v. <u>United States Dep't. of Agriculture</u>, 225 F.3d 1331, 1335 (Fed. Cir. 2000) (referencing <u>SEC</u> v. <u>Chenery Corp.</u>, 318 U.S. 80, 87-88 (1943). I would, therefore, reach the question of whether the termination agreement extinguished or reserved Montaup's right to FERC-ordered refunds.

                               II

Section 7 of the termination agreement provides, "To the extent that continuation or survival of the rights and obligations of Boston Edison and Montaup under the Power Sale Agreement are not expressly provided for in this Amendment, they are hereby extinguished." FERC (and Montaup as amicus) argue that sections 6 and 15 of the termination agreements support its position that FERC-ordered refunds were expressly reserved rather than extinguished.

> Section 15 of the termination agreement provides:
>
> Montaup reserves all rights and defenses that exist pursuant to the Power Sale Agreement and prior settlements between the Parties with respect to any amount <u>paid by Montaup pursuant to this Amendment</u>, including but not limited to such costs that are incurred by reason of Boston Edison's negligence, willful misconduct, or violation of any law or regulation.

-31-

(Emphasis added).  Boston Edison does not charge return on equity "pursuant to this Amendment;" return on equity is fixed in the base entitlement contracts.  Thus, since Montaup is not making return on equity payments "pursuant to this Amendment," section 15 cannot reserve any rights with respect to such payments.

> Section 6 of the termination agreement provides:

> Billing and Accounting.  The Parties' respective <u>rights and obligations</u> associated with billing, payment, accounting and <u>refunds</u> for charges incurred by Montaup pursuant to the Power Sale Agreement prior to the Effective Date shall be determined <u>in accordance with Section C-8</u> of the Power Sale Agreement.

(Emphasis added).  Standing alone, the first part of this provision seems broad enough to encompass FERC-ordered refunds; however, the section unambiguously provides that any refund-associated right can only be determined pursuant to the procedures of section C-8 of the Power Sale Agreement.

> Section C-8 of the Power Sales Agreement discusses billing procedures.  For example, C-8.3 states:

> Buyer shall not have the right to challenge any monthly bill, to invoke arbitration of the same or to bring any court or administrative action of any kind

questioning the propriety of said bill after a period of one (1) year from the date the bill is rendered. In the case of a bill containing estimates, the Buyer shall not have the right to challenge the accuracy of said bill after a period of one (1) year from the date the bill is adjusted to reflect the actual amount.

Paragraph C-8 contains no provision explicitly authorizing Montaup to challenge the contractual rate of the return on equity by using its procedures. Moreover, it is unlikely that section C-8 implicitly gives Montaup such a right since the rate of return on equity was already explicitly established elsewhere in the contracts. The contracts also contain a provision requiring that amendments to the contract reflect the mutual agreement of the parties. It would nullify these amendment provisions if section C-8 were interpreted as giving Montaup the ability to challenge the return on equity provisions by mounting an attack through the provisions of section C-8. In addition, section C-8, during the life of the original contracts, was used only for the purpose of challenging the mathematical accuracy of bills and not as a mechanism for achieving unilateral change of the contract.

I would hold that the termination agreements extinguished Montaup's right to FERC-ordered refunds. Further,

-33-

since such an interpretation is determinative of Montaup's rights, there is no need to address whether FERC applied the correct standard, although I agree with the majority's discussion of that issue.