292 F.3d 831
 PROCESS GAS CONSUMERS GROUP, et al., Petitioners
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent
Tennessee Gas Pipeline Company and East Tennessee Group, Intervenors.
 No. 01-1151.
 United States Court of Appeals, District of Columbia Circuit.
 Argued May 14, 2002.
 Decided June 14, 2002.
 
 On Petition for Review of Orders of the Federal Energy Regulatory Commission.
 James M. Bushee argued the cause for petitioners and supporting intervenors. With him on the briefs were Barbara K. Heffernan, Debra Ann Palmer, Roy R. Robertson Jr., Jennifer N. Waters, Edward J. Grenier Jr. and Joshua L. Menter.
 Lona T. Perry argued the cause for respondent. On the brief were Cynthia A. Marlette, General Counsel, Federal Energy Regulatory Commission, Dennis Lane, Solicitor, and Laura J. Vallance, Attorney.
 G. Mark Cook and Howard L. Nelson were on the brief for intervenor Tennessee Gas Pipeline Company. Shemin V. Proctor entered an appearance.
 Before: GINSBURG, Chief Judge, RANDOLPH and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge TATEL.
 TATEL, Circuit Judge:
 
 
 1
 Petitioners challenge the Federal Energy Regulatory Commission's approval of Tennessee Gas Pipeline Company's proposed method for awarding pipeline capacity and allocating meter amendments. Finding that the Commission engaged in reasoned decision making with respect to both issues, we affirm.
 
 I.
 
 2
 The Natural Gas Act ("NGA"), 15 U.S.C. §§ 717, et seq., requires that natural gas companies charge "just and reasonable" rates for the transportation and sale of natural gas. Id. § 717c(a). To promote compliance with this mandate, the Act requires gas pipelines to file rate schedules with the Federal Energy Regulatory Commission and to notify the Commission of any subsequent changes in rates and charges. Id. § 717c(c), (d). On submission of a tariff revision, the Commission may hold a hearing to determine whether the pipeline has met its burden to show that the amended rates and charges are "just and reasonable." Id. § 717c(e).
 
 
 3
 This case involves a proposed tariff revision that Tennessee Gas Pipeline Company ("Tennessee") filed with FERC in 1996. In that revision, the company proposed adopting a net present value, or "NPV," method to allocate pipeline capacity and to process so-called "meter amendments." Two aspects of the revision are relevant here: whether Tennessee must impose a cap on the length of bids for pipeline capacity, and whether it must credit existing gas shippers' contracts for mainline capacity in evaluating meter amendment requests. We considered both issues in Process Gas Consumers Group v. FERC ("PGC I") and, finding FERC's reasoning defective, remanded to the Commission for further proceedings. 177 F.3d 995, 997 (D.C.Cir.1999). Here, we explain each issue in turn, first outlining FERC's original position, then summarizing our decision in PGC I, and finally describing the Commission's orders on remand — the subject of this petition.
 
 
 Capacity Allocation
 
 
 4
 Tennessee transports natural gas through a pipeline system stretching from the Gulf of Mexico to New England. Historically, the company awarded "firm capacity" — transportation for which the pipeline guarantees delivery, as distinct from "interruptible capacity," for which delivery can be delayed if and when the pipeline has insufficient capacity to meet all customers' demands, see PGC I, 177 F.3d at 997 n. 1 (internal quotation marks and citation omitted) — on a first-come, first-served basis. The first shipper to submit a request received the available capacity, even if the shipper requested service for only a few days or weeks while others sought transportation for longer periods.
 
 
 5
 Recognizing the inefficiency of this capacity allocation method, Tennessee's 1996 tariff revision proposed adoption of an NPV method, under which the company would announce an "open season" whenever it wanted to sell capacity, accept a range of bids, compare the bids by discounting the value of each bid to the present, and accept the bid with the highest NPV. This new system, the pipeline argued, would permit it to award firm capacity to those shippers who value the capacity most — that is, since rates are capped, to those shippers offering the longest contracts.
 
 
 6
 Responding to Tennessee's proposal, various parties, including petitioner Process Gas Consumers Group, an association of industrial users of natural gas, warned that although FERC sets the maximum rate Tennessee may charge for transporting gas, the pipeline could exercise its market power to induce shippers to bid for longer contracts than they would in a competitive market. In other words, the commenters worried that shippers would "us[e] long contract duration as a price surrogate to bid beyond the maximum approved rate," United Distribution Cos. v. FERC, 88 F.3d 1105, 1140 (D.C.Cir.1996) ("UDC"), thereby giving Tennessee insurance against future instability in the natural gas market. The commenters urged FERC to address this concern by capping the duration of bids Tennessee could consider in its NPV calculations, "to simulate the end product of a competitive market." PGC I, 177 F.3d at 998.
 
 
 7
 Ultimately, FERC approved Tennessee's proposed switch from the first-come, first-served to the NPV approach. Tenn. Gas Pipeline Co., 76 F.E.R.C. ¶ 61,101, at 61,522 (1996). In response to the commenters' market power concerns, however, the Commission suggested that the pipeline "include a uniform cap" on the length of bids submitted during open seasons. Id. at 61,519. Acquiescing, Tennessee proposed a twenty-year cap, explaining that it chose such a high cap because "bids beyond the [twentieth] year are unlikely to have a significant impact on the NPV analysis." PGC I, 177 F.3d at 998-99 (internal quotation marks and citation omitted).
 
 
 8
 Following another comment period, FERC approved the twenty-year cap. The Commission dismissed Process Gas's objection that the cap was too long to provide adequate protection against the pipeline's market power on the ground that "`[b]idders are not forced into the maximum duration [of twenty years].... Rather, the primary issue here, is ... when two shippers both desire new capacity should that capacity go to a shipper who values it more, i.e., for a longer term, than another shipper who might value it less.'" Id. at 999-1000 (quoting Tenn. Gas Pipeline Co., 79 F.E.R.C. ¶ 61,297, at 62,339 (1997)). Unsatisfied with this response, Process Gas filed a petition for review, contending that FERC "failed to engage in reasoned decision making" in accepting the twenty-year cap. Id. at 997.
 
 
 9
 In our first encounter with these issues in PGC I, we found Process Gas's argument persuasive. Noting FERC's acknowledgment that "the market served by Tennessee's pipeline has monopolistic characteristics," we held that the Commission had not adequately justified its conclusion that a twenty-year cap would "prevent the NPV method from compelling shippers to offer the pipeline longer contracts than they would in a competitive market." Id. at 1003. We pointed out that the data on which FERC based its approval of the cap — "three previous Commission decisions involving ten and fifteen year ... agreements" — in fact suggested that "competitive market contracts typically run to no more than fifteen years." Id. In light of that evidence, we continued, "a twenty-year cap would allow Tennessee's market power to induce excessively long bids." Id. We recognized the legitimacy of FERC's "goal of encouraging the allocation of pipeline capacity to parties willing to pay the most for it," but reminded the Commission of its "need to balance th[at] goal with its duty to prevent exploitation of Tennessee's monopoly power." Id. at 1004. Observing that "the orders suggest... FERC approved the twenty-year cap because, functionally, twenty years would amount to no cap at all," we remanded to the Commission, directing it to "take the problem [of Tennessee's monopoly power] seriously and confront it with a forthright explanation of why a twenty-year cap would not augment that power." Id. at 1005.
 
 
 10
 FERC then took an entirely different tack. Noting that when orders are remanded, an agency generally has "discretion to reconsider the whole of its original decision," Tenn. Gas Pipeline Co., 94 F.E.R.C. ¶ 61,097, at 61,398 (2001) ("Rehearing Order") (internal quotation marks and citation omitted), aff'g 91 F.E.R.C. ¶ 61,053 (2000) ("Remand Order"), FERC not only declined to impose a shorter cap on capacity bids, but removed the cap altogether, explaining that, for various reasons, there is little risk that Tennessee will exercise its monopoly power to force shippers into excessively long contracts. Process Gas sought rehearing, but the Commission denied its petition. Rehearing Order, 94 F.E.R.C. at 61,401.
 
 
 Meter Amendments
 
 
 11
 The second relevant aspect of Tennessee's 1996 tariff revision involves meter amendments. PGC I explained this term as follows:
 
 
 12
 When natural gas is shipped through a pipeline, the points at which the gas enters and leaves the system are called "receipt" and "delivery" points, respectively. A firm transportation shipper selects "primary" receipt and delivery points ... [as] part of its contract with the pipeline. Designating a point as primary guarantees the shipper use of the point, an important right when the pipeline lacks sufficient capacity at the point to satisfy demand. Firm shippers can select other points on a secondary basis, but can only use those points if there is sufficient capacity beyond that taken by shippers using them on a primary basis. A change in a primary receipt or delivery point is ... referred to as a "meter amendment" because gas is measured at these points.
 
 
 13
 177 F.3d at 1000.
 
 
 14
 The issue here concerns Tennessee's method for allocating new primary points as they become available. Historically, Tennessee permitted existing shippers to switch primary points on a first-come, first-served basis as long as the chosen new points were available and the shippers notified the pipeline far enough in advance. When Tennessee adopted its new NPV method for allocating mainline capacity, however, the company indicated that it also intended to use this method to allocate primary points. Thus, "[a] meter amendment request would trigger an open season[,] and the requester would have to compete with other interested shippers on the basis of NPV." Id. at 1001.
 
 
 15
 This new approach generated considerable controversy because in calculating the NPV of competing bids for a particular primary point, Tennessee declined to credit existing shippers' preexisting promise to pay for firm capacity on the company's mainline. That is, the pipeline proposed to assign promised future payments an NPV of zero. Under this system, therefore, an existing shipper wishing to switch its primary delivery point from City A to City B could not compete against a new shipper wanting to purchase mainline capacity with a primary delivery point in City B: The existing shipper's promise to continue paying for its firm capacity would have an NPV of zero, while the new shipper's promise to pay for as-yet unallocated mainline capacity would have a positive NPV.
 
 
 16
 Various parties objected to the proposed change, claiming that applying this method to meter amendments was "inconsistent with FERC's professed aim of assuring that [existing] firm shippers have receipt and delivery point flexibility." PGC I, 177 F.3d at 1001. The Commission sided with Tennessee, however, emphasizing that "`allocating capacity to parties who value it the most'" would foster "`economic efficiency,'" and further, that nothing in the new NPV policy would prevent existing shippers from using the desired "points on a secondary basis." Id. (quoting Tennessee Gas, 79 F.E.R.C. at 62,337). The objecting parties sought rehearing and, when FERC declined to change its position, filed a petition for review.
 
 
 17
 Considering meter amendments in PGC I, we agreed with the commenters that FERC's approval of the NPV method emphasized "maximization of pipeline revenue" at the expense of "the ability of existing shippers to change primary points." Id. at 1005. We rejected FERC's notion that "shippers unable to obtain a point on a primary basis" could simply use the point on a secondary basis because the latter option would "not guarantee access to the point over any fixed period of time." Id. at 1005, 1006. "At the end of the day," we observed, "FERC's position is that regardless of the ability of existing shippers to compete" for points, "it is best to award primary point capacity on the basis of the amount of additional revenue generated for Tennessee. If existing shippers are injured, so be it." Id. at 1006. Rejecting this approach, we remanded the meter amendment issue to the Commission, explaining that, as we understood the situation:
 
 
 18
 Existing shippers entered into their contracts with Tennessee with the expectation of a certain amount of primary point flexibility. When the pipeline proposes to take away that flexibility altogether or reduce it substantially, FERC is obligated to provide a better explanation of why the shippers' resultant loss cannot be taken into account in a more balanced application of the NPV pricing system.
 
 
 19
 
 Id.
 
 
 
 20
 On remand, the Commission reconsidered its meter amendment ruling but again concluded that "it is just and reasonable" for Tennessee to use an "allocation method that gives a priority to bids [for primary points] which include a request for the related mainline capacity." Remand Order, 91 F.E.R.C. at 61,192. In response to Process Gas's petition for rehearing, the Commission reaffirmed its order. See Rehearing Order, 94 F.E.R.C. at 61,402.
 
 II.
 
 21
 Seeking review again, Petitioners challenge the Commission's approval of Tennessee's procedures for capacity allocation and meter amendments, reiterating many of the challenges raised in PGC I and arguing that the Commission's Remand and Rehearing Orders ignore that decision's express requirements. In reviewing these arguments, we "uphold FERC's factual findings if supported by substantial evidence and ... endorse its orders so long as they are based on reasoned decision making," Texaco, Inc. v. FERC, 148 F.3d 1091, 1095 (D.C.Cir.1998), and responsive to PGC I.
 
 
 22
 With these standards in mind, we begin with the capacity allocation issue. In its Remand and Rehearing Orders, FERC offers several explanations for its decision to revoke the cap on the duration of bids for pipeline capacity. Most important, the Commission argues that existing regulatory controls already limit Tennessee's market power, thereby "minimiz[ing any] danger" that the pipeline will "withhold... capacity from the market" to "create [the] artificial scarcity" necessary to force shippers to bid for supercompetitive contract terms. Rehearing Order, 94 F.E.R.C. at 61,398. Specifically, FERC cites its regulations (1) setting the maximum rate Tennessee may charge for its transportation services, and (2) requiring Tennessee to sell all available capacity to shippers willing to pay that maximum rate. Id. Given these regulatory limitations, the Commission contends, "the only way Tennessee could withhold capacity to force shippers to accept longer contract terms is by refusing to build additional capacity" to meet increased demand. Remand Order, 91 F.E.R.C. at 61,191. But, FERC continues,
 
 
 23
 [T]here is little reason for the pipeline to exercise market power by withholding new capacity because the maximum rates established by the Commission prevent [the pipeline] from charging rates above the just and reasonable rates based on its cost of service. As a result, even if the pipeline refused to build new capacity, its annual revenues in any given year would be capped at its annual cost of service. All that the pipeline could potentially accomplish by withholding new capacity is getting the customers to sign up for longer term contracts than they otherwise might.... But this gives the pipeline no immediate benefit in the form of increased revenues or profits. It just reduces its long-term risk somewhat by enabling it to obtain contracts with longer terms. By contrast, if the pipeline built new capacity to serve the increased demand, it could increase its current revenue and profits.... As a result, even without a term matching cap, it would appear that a pipeline has a greater incentive to build new capacity to serve all the demand for its service, rather than withhold capacity (by refusing to build new capacity) in order to create scarcity.
 
 
 24
 Id. (footnote omitted). According to FERC, therefore, to the extent shippers are bidding for longer contract terms than they would in a competitive market, they are motivated not by "pipeline monopoly power" but by competition with other shippers for scarce pipeline capacity. Id.
 
 
 25
 Reinforcing this argument, the Commission points out that if Tennessee ever refused to build new capacity to meet shippers' demands, the shippers "could file a complaint with the Commission." Id. Moreover, applicable rules, see 18 C.F.R. pt. 161, prohibit Tennessee from "favoring or colluding with its affiliates" "to manipulate the market through sham bids," Rehearing Order, 94 F.E.R.C. at 61,398, 61,400, so longer bids truly reflect shippers' desire to establish longer-term contracts with the pipeline.
 
 
 26
 Finally, the Commission explains that absent a "widespread competitive market for primary pipeline capacity," there is "no way of estimating what contract terms [such] a ... market ... would produce." Id. at 61,399 n. 8. Any cap would therefore be arbitrary — and imposing an arbitrary cap could "distort[] efficient operation of the market" by "prevent[ing] a shipper [who] is willing to offer a longer contract term ... from doing so." Id. at 61,399. Thus, the only efficient solution, FERC contends, is to eliminate the cap altogether and to rely on other regulatory controls to limit Tennessee's market power.
 
 
 27
 These several rationales for uncapping the NPV bidding process not only satisfy our deferential standard of review but also address our principal concern in PGC I — FERC's failure to articulate how a twenty-year cap would prevent Tennessee from exploiting its monopoly power. No longer relying on a cap to accomplish that objective, FERC now explains that other regulatory constraints adequately limit Tennessee's ability, as well as any incentive, to induce lengthy contracts. We think this persuasive for two reasons. First, because the Commission already regulates the rates pipelines may charge and requires them to sell all available capacity at those rates, we agree with FERC that Tennessee has neither the legal ability to withhold existing capacity nor an incentive to refuse to build new capacity. Second, any effort by Tennessee affirmatively to manipulate the bidding process would violate other Commission rules and would therefore presumably be actionable. Accordingly, as FERC argues, the fact that shippers may at times bid up contract length likely reflects not an exercise of Tennessee's market power, but rather competition for scarce capacity. See Remand Order, 91 F.E.R.C. at 61,190. The data the Commission cites, moreover, indicate that the recent trend has been toward shorter capacity contracts and, relatedly, that the average length of post-1997 contracts is only 5.8 years — empirical facts demonstrating that, as FERC predicted, most of the time shippers have been able to obtain firm capacity without submitting excessively long bids. Rehearing Order, 94 F.E.R.C. at 61,401.
 
 
 28
 Even if we were skeptical of the Commission's conclusion regarding existing regulatory controls, however, that conclusion embodies precisely the sort of prediction about the behavior of a regulated entity to which — in the absence of contrary evidence — we ordinarily defer. As we have repeatedly observed, "it is within the scope of the agency's expertise to make... a prediction about the market it regulates, and a reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view." Envtl. Action, Inc. v. FERC, 939 F.2d 1057, 1064 (D.C.Cir.1991).
 
 
 29
 Challenging FERC's decision to remove the cap on bid duration, Petitioners repeatedly compare the bidding process for new capacity — at issue here — to the bidding process for capacity that becomes available on expiration of an existing shipper's contract. Some understanding of the latter situation is necessary to see why this comparison falls short. Put simply, under FERC's current rules, when an existing shipper's contract for firm capacity expires, the shipper has the right "to retain its service from the pipeline under a new contract by matching the rate and duration offered by the highest competing bid — up to the maximum `just and reasonable' rate approved by FERC." Interstate Natural Gas Ass'n of Am. v. FERC ("INGAA"), 285 F.3d 18, 51 (D.C.Cir.2002). In a series of opinions, we have questioned FERC's position regarding the need for and the proper length of a cap on the duration of such "right-of-first-refusal bids," to protect existing shippers from routinely losing their firm capacity to new customers offering longer terms. See id. at 51-53. The situation is currently in flux, with this court having remanded a twenty-year and, more recently, a five-year cap to the Commission, first "for failing to explain the length" and then for "failing to explain the brevity." Id. at 53 (citing UDC, 88 F.3d at 1140-41).
 
 
 30
 Regardless of what cap, if any, the Commission eventually prescribes (and adequately supports) for right-of-first-refusal bids, however, that cap has nothing to do with the issue now before us. True, in PGC I, we cautioned FERC that its attempt to distinguish the right-of-first-refusal context from new capacity allocation "seem[ed] ... a distinction without a difference." PGC I, 177 F.3d at 1004. If the data underlying the cap on right-of-first-refusal bids are irrelevant in the context of new capacity allocation, we continued, "FERC has yet to tell us why." Id. We now understand why. As INGAA explains, the requirement to protect existing shippers from pipeline market power derives directly from Section 7(b) of the Natural Gas Act, which "generally prohibits `natural-gas compan[ies]' from ceasing to provide service to their existing customers unless, after `due hearing,' FERC finds `that the present or future public convenience or necessity permit such abandonment.'" 285 F.3d at 51 (quoting 15 U.S.C. § 717f(b)) (alteration in original). No comparable statutory provision requires FERC to protect new shippers from competition for limited capacity (provided the final rates are just and reasonable). With no entrenched interests requiring protection, the Commission is free to conclude that an uncapped bidding process maximizes market efficiency by identifying which shipper is willing to pay the most — in terms of contract length — to obtain such capacity.
 
 
 31
 This brings us to meter amendments. Addressing that issue, FERC's Remand and Rehearing Orders make two principal points. First, Tennessee's FERC-approved rate schedule only permits existing shippers to "`elect to substitute new [primary points] ... in [their] service agreement[s] ... if there is []adequate capacity available to render this new service.'" Remand Order, 91 F.E.R.C. at 61,192 (quoting Schedule 4.7 of Tennessee's Rate Schedule FT-A). Significantly, neither this schedule nor relevant Commission orders address potential "conflicts" between "existing and new shippers for primary point capacity that may become available." Id. Thus, FERC maintains, while existing shippers do have "an expectation of a certain amount of primary point flexibility," PGC I, 177 F.3d at 1006, that expectation extends only to available primary points; nothing in an existing shipper's relationship with Tennessee entitles it to win contested primary points from new shippers wishing to purchase the point and associated mainline capacity. See Remand Order, 91 F.E.R.C. at 61,192, 61,193 ("[W]e do not find that [an existing shipper's] contract, the pipeline's tariff or our policy guarantees complete portability of ... capacity at all times."); Rehearing Order, 94 F.E.R.C. at 61,402 ("[T]hat Tennessee's tariff gives shippers the ability to elect to amend primary points where capacity is available does not decide the issue of how to choose between two shippers seeking primary rights at a point, where there is only sufficient capacity for one ... to have primary rights."). Given this framework, the Commission continues, Tennessee has no obligation to treat existing shippers any differently from new shippers when awarding contested primary points. Rather, the pipeline may design any "reasonable" point allocation method. Rehearing Order, 94 F.E.R.C. at 61,402.
 
 
 32
 Continuing from this premise, FERC's second argument is that Tennessee's chosen point allocation method, which assigns existing shippers' firm capacity contracts an NPV of zero and therefore "consider[s] only new, incremental revenue in awarding... points," id., is "just and reasonable," Remand Order, 91 F.E.R.C. at 61,192. According to the Commission, it is entirely reasonable for Tennessee to adopt a point allocation method that "produce[s] greater revenue for the pipeline" by assuring the sale of additional mainline capacity. Rehearing Order, 94 F.E.R.C. at 61,402. Moreover, the sale of such capacity increases "throughput on the system," so "at such time as Tennessee ... file[s] a new rate case, there will be a greater number of units of service over which to spread Tennessee's fixed costs" — a development that will "benefit[] all [of] Tennessee's shippers by allowing Tennessee's rates to be lower than they otherwise would be." Id.; see also Remand Order, 91 F.E.R.C. at 61,193. The Commission also points out that even before Tennessee adopted the NPV method, existing shippers only had the right to change to available primary points; they never had a guarantee that any particular point would be available at any particular time. Consequently, those shippers "should have been prepared to rely on [their contractually designated] point[s] for purposes of bringing gas supplies onto the pipeline for the term of the[ir] contract[s]." Rehearing Order, 94 F.E.R.C. at 61,402. Finally, FERC observes that (1) even after adoption of the NPV method, about ninety percent of existing shippers' "requests to change primary points have been granted," Remand Order, 91 F.E.R.C. at 61,193; (2) Tennessee's system has much greater point capacity than mainline capacity, Rehearing Order, 94 F.E.R.C. at 61,402; and (3) "Tennessee must provide for pooling of [gas] supplies at points downstream of its primary receipt points," enabling "shippers to obtain supplies that originate from many different upstream receipt points," id. at 61,402-03. As the Commission notes, these three factors suggest that existing shippers will rarely have to rely solely on their contractual primary points for receipt of gas. Id.
 
 
 33
 Again, we find these explanations adequate to satisfy both our standard of review and PGC I. Now that FERC has clarified the nature of existing shippers' "expectation ... of primary point flexibility," PGC I, 177 F.3d at 1006, we understand that Tennessee has no obligation to give such shippers a preference in competitive bidding for contested primary points. In the absence of such an obligation, we think it eminently reasonable for Tennessee to adopt a point allocation method that promotes the sale of available mainline capacity. Not only does Tennessee's chosen method benefit the pipeline in the short term (and existing shippers when and if the pipeline files a new rate case), but it ensures that available points go to shippers who value them most — those willing to pay for associated mainline capacity.
 
 III.
 
 34
 In sum, we disagree with Petitioners that the Commission's latest orders "ignore" PGC I. Pet'rs' Reply Br. at 3. That decision required only that FERC better explain its reasoning in setting a twenty-year cap on bids for new mainline capacity and approving the NPV method for evaluation of meter amendment requests. On remand, the Commission fully complied with that requirement, reevaluating both issues and satisfactorily explaining its ultimate decisions to eliminate the bid cap altogether and to reaffirm the meter amendment ruling. The petition for review is denied, and the orders of the Commission are affirmed.
 
 
 35
 
 So ordered.